1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| HTC Corporation and HTC America, Inc., | CASE NO. 2:17-cv-534 |
| Plaintiffs, | |
| v. | **COMPLAINT FOR:**<br>**(1) BREACH OF CONTRACT;**<br>**(2) BREACH OF THE IMPLIED** |
| Telefonaktiebolaget LM Ericsson and Ericsson Inc., | **COVENANT OF GOOD FAITH &**<br>**FAIR DEALING; AND**<br>**(3) PROMISSORY ESTOPPEL.** |
| Defendants. | JURY DEMAND |

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

COMPLAINT FOR BREACH OF CONTRACT
CASE NO. 2:17-cv-534

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

## INTRODUCTION

1.      Plaintiffs HTC Corporation and HTC America, Inc. (collectively, "HTC") bring these claims to require Defendants Telefonaktiebolaget LM Ericsson and Ericsson Inc. (collectively, "Ericsson"), to abide by their promises to license certain patents—patents that Ericsson itself deemed "essential" to the standards adopted by the cellular and wireless technology industry—on terms that are "fair, reasonable, and nondiscriminatory" or "FRAND".

2.      Today, technology markets are increasingly dependent on the orderly and consensus-based adoption of various "standards" within particular industries.  According to the Federal Trade Commission, the promulgation and adoption of technology standards "are widely acknowledged to be one of the engines of the modern economy" and "serve as a fundamental building block for international trade."[1]

3.      Cellular and wireless technology, and the companies that manufacture mobile devices that use that technology, are especially dependent on standards.  The widespread adoption of uniform standards is critical to the interoperability of phones, tablets, and other mobile devices and has propelled the rapid advancement of these globe-changing products.

4.      In order to practice industry standards, it is often necessary for the market to use patented technology that is "essential" to that particular standard.  To protect companies from the possibility that patent holders will abuse their market power, engage in patent hold-up, or demand unreasonable terms once their technology has been chosen, the markets depend on a licensing paradigm known as FRAND—i.e., that licenses for these "essential" patents will be available on license terms that are fair, reasonable, and non-discriminatory to anyone who seeks to practice the standard.  As its name suggests, FRAND pricing ensures an equal playing field (regardless of negotiating power) and controls the pricing to license standard-essential patents. In doing so, FRAND terms encourage development, collaboration, and competition.

---

[1] U.S. Dep't of Justice and U.S. Fed. Trade Comm'n, *Antitrust Enforcement and Intellectual Property Rights: Promoting Competition and Innovation April 2007 Report* (Apr. 17, 2007), https://www.justice.gov/sites/default/files/atr/legacy/2007/04/17/intro.pdf.

COMPLAINT FOR BREACH OF CONTRACT
CASE NO. 2:17-CV-534 – PAGE 2

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

5.      Indeed, the Ninth Circuit has been clear that the purpose of FRAND is to mitigate or prevent holders of standard-essential patents ("SEPs") from extracting more than their fair share of value through licensing such patents.

6.      This dispute involves the technology standards underlying the world's cellular networks, including second generation (2G), third generation (3G), and fourth generation (4G) telecommunications standards, including CDMA2000 (collectively, "Mobile Cellular Standards"), as well as wireless local area network ("WLAN") standards ("Wireless Standards"). As cellular and wireless technologies became a pervasive part of daily life for billions of people around the globe, Ericsson sought to capitalize on that explosive growth by participating in international standards development organizations, such as ETSI[2] and the IEEE-SA.[3]  Then, pursuant to ETSI's and the IEEE-SA's policies, Ericsson began designating thousands of its patents as "essential" to ETSI's telecommunications standards and the IEEE-SA's wireless standards.  Having voluntarily designated its technology as "essential" to these standards—a designation that Ericsson itself sought—Ericsson is now bound to offer licenses to these patents on FRAND[4] terms.  In other words, Ericsson is contractually obligated to offer license terms that are fair, reasonable, and non-discriminatory to each and every company that needs and is willing to pay for a license to these patents.

7.      HTC—a leading manufacturer of mobile products that has consistently demonstrated its respect for intellectual property and patent rights—is one such licensee and has

---

[2] Short for the European Telecommunications Standards Institute, ETSI produces global standards for Information and Communications Technologies (ICT), including fixed, mobile, radio, converged, broadcast, and Internet technologies.  ETSI is a not-for-profit organization with more than 800 member organizations in 68 countries and five continents.

[3] Analogous to ETSI, the Institute of Electrical and Electronics Engineers Standards Association, the IEEE-SA produces the global standards in a broad range of disciplines, including electric power and energy, biomedical technology, information technology, information assurance, telecommunications, consumer electronics, transportation, aerospace, and nanotechnology.

[4] Although the IEEE-SA uses the term RAND (reasonable and nondiscriminatory) rather than FRAND, the two terms are generally used interchangeably by the industry.

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1   been so since 2003.  Specifically, HTC has held a license to Ericsson's SEPs since 2003 and has

2   made significant payments to Ericsson over the years to maintain that license.  Although the

3   Ericsson/HTC license terms are confidential, publicly-available information makes plain that

4   Ericsson has profited handsomely from its SEP portfolio from the myriad of companies that

5   practice these standards, including HTC.

6        8.     In addition to making substantial payments to Ericsson, HTC has also contributed

7   to the widespread adoption of telecommunications and wireless standards, particularly 3G and

8   4G standards, and their subsequent advancement throughout the globe.  HTC made those

9   investments in reliance on the promises by Ericsson (and other SEP holders) that HTC would

10  receive FRAND pricing for the life of the telecommunications SEPs.  Thanks in part to HTC's

11  early adoption of 3G and 4G, and its subsequent years of innovation, HTC helped turn Ericsson's

12  SEPs into a very lucrative asset that Ericsson has been enjoying for years.

13       9.     Years later, as the industry licenses are coming due for renegotiation, Ericsson is

14  breaching its promises to adhere to FRAND principles.  Instead, Ericsson is abusing its patent

15  position and making unreasonable licensing demands that do not reflect market realities or any

16  objective FRAND royalty valuation methodology.

17       10.     HTC's SEP license with Ericsson, for example, expired on December 31, 2016.

18  HTC has communicated its willingness to license Ericsson's SEPs, and is seeking to enter a new

19  license to Ericsson's SEP portfolio.  Times have changed though, and the market conditions

20  today are not the same as when the parties first negotiated this license in 2003.  In 2003, for

21  example, the cellular industry was growing exponentially and HTC's own revenues were

22  growing at an incredible rate.  In 2008, the cellular industry continued to grow steadily and the

23  industry benefited from the general consumer shift from older generation mobile phones to new

24  smartphones.  HTC in particular benefited from this transition as it released the world's first

25  Android phone, the HTC Dream (also known as the G1) in September 2008, while Ericsson and

26  other ETSI contributors benefited from the increasingly widespread adoption of 3G and the

27  newly launched 4G.

COMPLAINT FOR BREACH OF CONTRACT
CASE NO. 2:17-CV-534 – PAGE 4

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1    11.    Today, the world looks very different.  2G and 3G are now legacy technologies,

2  and even 4G will soon give way to the next generation of telecommunications standards.  Major

3  wireless carriers in the United States, including AT&T, T-Mobile, and Verizon Wireless, have

4  shut down or announced plans to shut down their 2G and 3G networks over the next two years,

5  making way for 5G networks that are expected to be deployed on a large-scale by 2019.  The

6  product features driving pricing and consumer demand now have nothing to do with 2G, 3G, or

7  4G technology (e.g., camera functionality, storage capacity, touch screen, user interface,

8  operating system, and applications).  Further, Ericsson's SEPs have begun to expire at a rapid

9  rate—a trend that will only accelerate over the life of the license at issue here.  Finally, like other

10  manufacturers in this industry, the average selling price (ASP) for HTC's mobile devices

11  (despite increasingly superior product features) has dropped dramatically in recent years.

12    12.    With declining growth, new technologies and features, an expiring patent

13  portfolio, and lower ASPs, the value of Ericsson's SEPs are significantly in decline.  Rather than

14  acknowledging this reality—which it must under FRAND principles—Ericsson is demanding

15  licensing fees that are unreasonable and unsupported by any defensible valuation methodology.

16  Ericsson publicly acknowledges as much.  Although Ericsson has acknowledged that ASPs

17  have fallen dramatically in recent years, Ericsson continues to demand royalties determined

18  using past royalty rates paid under old license agreements or royalty rates that were calculated

19  using the overall value of the entire value of the device without accounting for the changes in

20  ASPs.  The shortcomings to such methodologies are obvious, i.e., they do not account for

21  market realities or for the product features that manufacturers, like HTC, have added to their

22  devices over the last eight years or the emergence of alternative and next-generation

23  technologies.  Because they are divorced from market conditions, Ericsson's demands are

24  inherently unreasonable and unfair.

25    13.    To be clear, HTC does not dispute that there is some value left in Ericsson's SEP

26  portfolio or that HTC should pay a fair and reasonable rate to license Ericsson's SEP portfolio.

27  But Ericsson's Mobile Cellular and Wireless SEPs are worth substantially less today than they

COMPLAINT FOR BREACH OF CONTRACT
CASE NO. 2:17-CV-534 – PAGE 5

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

did when the industry first adopted the standards in the early 2000s, and Ericsson is obligated to offer license terms that are fair and reasonable under current circumstances. Because Ericsson did not provide a fair and reasonable valuation methodology for its SEP portfolio, HTC has done that work itself. Specifically, HTC commissioned experts from the telecommunications field and industry to evaluate Ericsson's SEP portfolio using standard intellectual property valuations. These evaluations revealed that the actual fair and reasonable value of Ericsson's SEPs is substantially less than what Ericsson is demanding. Accordingly, HTC responded to Ericsson's demands by making an offer that is fair, reasonable, and consistent with the valuations performed by HTC's industry experts. Ericsson, however, rejected HTC's fair and reasonable offer.

14.     Ericsson's licensing practices not only violate its contractual obligations to license its SEPs on FRAND terms, but it also violates black-letter patent law, especially recent case law regarding reasonable royalties calculations. For example, FRAND royalties must use the proper royalty base and a proper royalty rate. And FRAND royalties must reflect the actual technical contribution of the patented technology—rather than (a) the value of all the technologies incorporated in an entire standard, (b) the "lock in" value that arises from standardization of technologies—in which technologies gain value simply because companies must use them as part of the standard, and (c) the value of an entire device embracing many technologies beyond the standard.

15.     As a matter of black-letter patent law regarding patent valuation, patent royalties are typically determined from a royalty base that begins with the smallest saleable unit that substantially embodies the patented functionality—and that base may need to be further apportioned to isolate the value of the patented invention. And the royalty rate applied to that base must be reasonable and recognize other royalties levied by other patent holders on the royalty base—to avoid the problem of an unduly high total "royalty stack." The final royalty calculation must also account for end products that incorporate already-licensed components, such as chip components sold to HTC by a licensed manufacturer.

COMPLAINT FOR BREACH OF CONTRACT
CASE NO. 2:17-CV-534 – PAGE 6

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

16.     Ericsson's prior agreements with HTC pre-date many of the landmark cases outlining these basic patent valuation principles, but the new and forward-looking license must reflect these changes in patent law to be considered fair and reasonable.

17.     By demanding unreasonable and unfair rates, Ericsson is abusing its market power and its patent protection, in clear breach of its contractual obligations and breaking its promises to ETSI, the IEEE-SA, HTC, and all of the other adopters of 2G, 3G, 4G, and WLAN technologies.  If allowed, Ericsson's improper demands will result in significant damages to HTC, frustrate HTC's ability to offer competitively-priced products, and inhibit innovation.  And if left unchecked, Ericsson's abusive practices will not only disrupt the wireless industry and increase costs but will embolden holders of other essential patents (in this industry and others) to demand extortionate rates when their own licenses come up for renewal, thereby undercutting the FRAND licensing paradigm that is necessary to build trust and consensus and encourage investment in nascent or emerging standards in the first place.

18.     Accordingly, HTC brings this complaint for (i) breach of contract; (ii) breach of the implied covenant of good faith and fair dealing; and (iii) promissory estoppel; and seeks relief in the form of: (i) a judicial declaration that Ericsson's FRAND promises constitute contractual obligations that are binding and enforceable by HTC; (ii) a judicial declaration that Ericsson has breached these obligations by demanding excessive and discriminatory royalties from HTC; (iii) a judicial decree enjoining Ericsson from further demanding excessive royalties from HTC that are not consistent with Ericsson's FRAND obligations; and (iv) a judicial accounting of what constitutes a FRAND royalty rate consistent with Ericsson's promises to license its patents identified as (or alleged to be) essential to the 2G, 3G, 4G, and WLAN standards.

## THE PARTIES

### A.     HTC

19.     Plaintiff HTC Corporation is a Taiwanese corporation with its principal place of business at 23 Xinghua Road, Tayouan 330, Taiwan, R.O.C.

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

20.     Plaintiff HTC America, Inc. ("HTC America") is a Washington corporation with its principal place of business at 308 Occidental Ave S, Seattle, WA 98104.  HTC America is a wholly-owned American subsidiary of HTC Corporation that sells cellular and wireless devices in the United States.

21.     Founded in 1997, HTC is a pioneer in the smartphone market, credited with many industry firsts and technology breakthroughs over the past 19 years—a history defined by innovation, design and engineering excellence, and the building of strategic partnerships to facilitate the development of an industry ecosystem.  HTC has invested heavily in research and development, which accounts for about a third of its employees.

22.     HTC's growth accelerated dramatically in the early 2000s when it was selected to be Microsoft's first hardware platform development partner for the Windows Mobile operating system (based on Windows CE).  By 2005, HTC's annual sales revenue totaled more than $2 billion, and it was recognized as the fastest-growing tech company in BusinessWeek's Info Tech 100.  HTC also partnered with Google to build the first mobile phone running Google's Android mobile OS, HTC Dream or G1, which was released in September 2008.  Through these efforts, and others, HTC was amongst the pivotal players that adopted and advanced 3G and 4G technologies, including its introduction to, and widespread adoption by, consumers around the globe.  Since then, the market has changed significantly—both in terms of market share, consumer expectations, and overall growth.

## B.     ERICSSON

23.     On information and belief, Defendant Telefonaktiebolaget LM Ericsson is a Swedish corporation with its principal place of business in Stockholm, Sweden.

24.     On information and belief, Defendant Ericsson Inc. is a Delaware corporation with its principal place of business in Plano, Texas and an office in Bellevue, Washington.  Ericsson Inc. is a wholly-owned subsidiary of Telefonaktiebolaget LM Ericsson that develops, owns, and asserts standards-essential patents that are part of Ericsson's SEP portfolio.

COMPLAINT FOR BREACH OF CONTRACT
CASE NO. 2:17-CV-534 – PAGE 8

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

25.     On information and belief, Ericsson was founded in 1876 as a telegraph and telephone repair shop.  Ericsson has made and sold and/or makes and sells base stations and supporting software and services compliant with the Mobile Cellular Standards which are the part of the cellular infrastructure throughout the United States, including Washington and this District.

26.     In addition to its widespread sales of network equipment and support services throughout the United States, Ericsson also aggressively monetizes its portfolio of intellectual property rights—including its patents declared essential to the Mobile Cellular and Wireless Standards—by enforcing its patents against or licensing to companies like HTC that sell mobile handsets to consumers in the United States.

## JURISDICTION AND VENUE

27.     This Court has jurisdiction over the subject matter of this dispute pursuant to 28 U.S.C. § 1332(a)(3) because this is an action between citizens of different states and because the value of declaratory and injunctive relief sought, the value of HTC's rights this action will protect and enforce, and the extent of the injury to be prevented exceed the amount of $75,000, exclusive of interest and costs.

28.     Defendants are subject to this Court's general personal jurisdiction, consistent with the principles of due process and the Washington Long Arm Statute.  Defendants maintain an office and facilities in the Western District of Washington, have employees in the Western District of Washington, offer products for sale in the Western District of Washington, and routinely transact business in this District.  Defendants' general business operations in the Western District of Washington not only involve the sale of products to Western District of Washington consumers and residents, but include significant research, development, and testing of mobile technologies (including the technologies at issue in this litigation, such as LTE) and commercial transactions with mobile device companies and wireless carriers located in the Western District of Washington.  In addition to maintaining an office and conducting significant activities in Bellevue, Washington relating to mobile device technology and the SEPs,

COMPLAINT FOR BREACH OF CONTRACT
CASE NO. 2:17-CV-534 – PAGE 9

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

Defendants also have offices throughout the United States, including Plano, Texas; Pleasanton, California; Santa Clara, California; Waltham, Massachusetts; Denver, Colorado; and New York City, New York.  Accordingly, Defendants transact substantial business in this District and throughout the United States, and thus voluntarily avail themselves of the laws of the United States and Washington so as to be subject to the jurisdiction of this Court.

29.     Defendants are also subject to specific personal jurisdiction in Washington.  In addition to the conduct and activities discussed above, Defendants have previously entered and sought to negotiate payments for a license covering products sold by HTC America, Inc., which is a Washington corporation with its principal place of business in Seattle, Washington.  Additionally, HTC Corporation, on behalf of its subsidiary HTC America, Inc., has been involved in negotiations with Ericsson attempting to obtain a FRAND rate for the license that would be granted by Defendants.

30.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(a), 1391(c), and 1931(d).

## BACKGROUND

### A.    INTRODUCTION TO STANDARDS

31.     The development and adoption of industry standards is a critical aspect of today's technology market.  In simple terms, a standard provides rules or guidelines to achieve consensus and order in regards to a particular technology.  In the context of telecommunications technology, standards provide interconnection and interoperability so that users, who are increasingly mobile and use a variety of products from different manufacturers, can "mix and match" equipment, services, and providers.

32.     As the U.S. Federal Trade Commission has recognized:

> Industry standards are widely acknowledged to be one of the engines of the modern economy.  Standards can make products less costly for firms to produce and more valuable to consumers.  They can increase innovation, efficiency, and consumer choice; foster public health and safety; and serve as a "fundamental building block for international trade."  Standards make

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

networks, such as the internet and telecommunications, more valuable to consumers by allowing products to interoperate.[5]

33. Technology standards are typically promulgated by entities known as "Standard Development Organizations" or "SDOs" whose participants voluntarily engage in the standards program to benefit their members and affiliates, including third parties implementing the standards, as well as the end users of the products.[6]

34. SDO participants enjoy significant potential benefits to having their technology adopted by the SDO. Most obviously, when a standard is broadly adopted, the patent holder is likely to receive royalties (on a FRAND basis) from a large pool of adopters for many years. But there are other benefits as well, including recognition of leadership in the industry, increased demand for the patent holder's other products, internal familiarity with the selected technology (potentially leading to a head start or shorter development times), and improved compatibility with products made by third parties that also use the adopted standard.

## B.  ETSI AND THE IEEE-SA, THEIR STANDARDS, AND THEIR INTELLECTUAL PROPERTY RIGHTS POLICIES

35. Several SDOs and other collaborations are relevant here. As discussed above, ETSI is an independent, non-profit SDO that is responsible for the standardization of information and communication technologies, including mobile cellular technologies. 3GPP is a collaborative group of recognized SDOs in the information and communication industry, including ETSI. ETSI and 3GPP have jointly worked together, and with others in the cellular

---

[5] U.S. Dep't of Justice and Fed. Trade Comm'n, *Antitrust Enforcement and Intellectual Property Rights: Promoting Competition and Innovation April 2007 Report* (Apr. 17, 2007), https://www.justice.gov/sites/default/files/atr/legacy/2007/04/17/intro.pdf.

[6] The engineers and developers who work on the technologies that are adopted by the SDOs are not employees of those SDOs. Instead, they are usually employees of companies in the industry, such as Qualcomm, Samsung, Alcatel-Lucent, Nokia, Ericsson, Motorola, Nortel, and others that are members of the SDOs and participate in the standard-setting process. Many of these companies file for patents that cover technologies they believe are essential to implement the standards.

COMPLAINT FOR BREACH OF CONTRACT
CASE NO. 2:17-CV-534 – PAGE 11

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

industry, for years to develop broadly accepted standards for cellular technologies, including 2G, 3G, and 4G. The IEEE Standards Association ("IEEE-SA") is the standards-setting arm of the IEEE. The IEEE-SA promulgates technical standards in a variety of fields, including wireless communications and telecommunications.

36.     To ensure that adopters are not captive to abusive and anticompetitive practices by patent holders, ETSI and the IEEE-SA—like other SDOs—adopted rules, policies, and procedures that create a paradigm for disclosing and licensing patents that are "essential" to the standards under consideration. These rules, policies, and procedures are set out in the intellectual property rights ("IPR") policies ("IPR Policies").

37.     Many IPR Policies, including ETSI's and the IEEE-SA's, require participants to timely disclose any IPRs (such as patents or patent applications) that the patent holder reasonably believes will become essential to the standard under consideration. These disclosures permit the SDOs and their members to evaluate technologies with knowledge of disclosed IPRs that may affect the costs of implementing the standard. IPR Policies, including ETSI's and the IEEE-SA's, also require participants claiming to own relevant patents to grant licenses for those patents with any implementer of the standard on FRAND terms.

38.     ETSI's IPR Policy unambiguously requires the patent owner to grant irrevocable licenses on FRAND terms for patents that are essential to its standards.

39.     Specifically, Clause 6 of ETSI's IPR Policy states:

> When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an irrevocable undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory ("FRAND") terms and conditions.

40.     If the essential IPR owner refuses to undertake the requested commitment and informs ETSI of that decision, the ETSI General Assembly must "review the requirement for that STANDARD or TECHNICAL SPECIFICATION and satisfy itself that a viable alternative technology is available for the STANDARD or TECHNICAL SPECIFICATION" that is not

COMPLAINT FOR BREACH OF CONTRACT
CASE NO. 2:17-CV-534 – PAGE 12

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1  blocked by that IPR and satisfies ETSI's requirements.  ETSI IPR Policy, cl. 8.1.1.  Absent such

2  a viable alternative, the ETSI IPR Policy requires that "work on the STANDARD or

3  TECHNICAL SPECIFICATION shall cease."  *Id.*, cl. 8.1.2.  In other words, ETSI will not agree

4  to incorporate a member's technology in a standard under consideration unless the member

5  irrevocably binds itself to granting licenses on FRAND terms.

6      41.    The IEEE-SA had an IPR policy at the time it was drafting the 802.11 (WLAN)

7  protocols.  Under the IPR policy, the IEEE-SA would request Letters of Assurance from

8  individuals participating in IEEE standards development who believed they owned patents or

9  patent applications that might be "essential" to implement an IEEE standard under development.

10      42.    The requirements for the Letters of Assurance sought by the IEEE-SA are set

11  forth in Clause 6 of the IEEE-SA Standards Board Bylaws.  Clause 6 of those Bylaws (which

12  was revised slightly over the years) provides in pertinent part:

13          A Letter of Assurance shall be either:

14
15         a) A general disclaimer to the effect that the submitter without
       conditions will not enforce any present or future Essential Patent
       Claims against any person or entity making, using, selling,

16         offering to sell, importing, distributing, or implementing a
       compliant implementation of the standard; or

17
18         b) A statement that a license for a compliant implementation of
       the standard will be made available to an unrestricted number of

19         applicants on a worldwide basis without compensation or under
       reasonable rates, with reasonable terms and conditions that are

20         demonstrably free of any unfair discrimination.

21      43.    If the Letters of Assurance were not provided for patents asserted to be "essential"

22  by participants, the IEEE working group either would revise the standard to avoid any potential

23  issues related to those patents, discontinue work on the standard altogether, or otherwise proceed

24  in a way that avoided exposure to discriminatory patent assertions and/or unreasonable licensing

25  terms.

26  //

27  //

44.     IPR Policies are critical protections for all the market and those companies that build products using the adopted standard.  As the United States Federal Trade Commission recently explained,

> [SDOs] have this policy because the incorporation of patented technology into a standard induces market reliance on that patent and increases its value.  After manufacturers implement a standard, they can become "locked-in" to the standard and face substantial switching costs if they must abandon initial designs and substitute different technologies.  This allows [standard-essential patent] holders to demand terms that reflect not only "the value conferred by the patent itself," but also "the additional value—the hold-up value—conferred by the patent's being designated as standard-essential."  The FRAND commitment is a promise intended to mitigate the potential for patent hold-up.  In other words, it restrains the exercise of market power gained by a firm when its patent is included in a standard and the standard is widely adopted in the market.[7]

45.     Thus, IPR Policies and members' commitment to encourage participants and affiliates to contribute their technologies to the standards and/or to implement the standards works to the benefit of consumers, who would be harmed by higher prices and fewer options if owners of standards-essential patents were able to demand unfair, unreasonable, or discriminatory licensing terms.

### Mobile Cellular and Wireless Standards

46.     At issue here are Ericsson's patents that Ericsson itself claims are essential to the 2G, 3G, 4G, and WLAN standards.

47.     The mobile cellular technologies described by the 2G, 3G, and 4G standards are enabling second, third, and fourth generation technologies for mobile voice and data communications.  2G technology was a culmination of work that began in the 1980s as a replacement for first generation ("1G") analog cellular networks for voice communications.  The first 2G cellular telecom networks were commercially launched on the Global System for Mobile

---

[7] U.S. Fed. Trade Comm'n, *Analysis of Proposed Consent Order to Aid Public Comment* In the Matter of Motorola Mobility LLC and Google Inc., *File No. 121-0120* (Jan. 2013), https://www.ftc.gov/sites/default/files/documents/cases/2013/01/130103googlemotorolaanalysis.pdf.

**COMPLAINT FOR BREACH OF CONTRACT**
CASE NO. 2:17-CV-534 – PAGE 14

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1   Communications ("GSM") standard in Finland in 1991.  The first GSM network became

2   operational in the United States in 1995.  The GSM 2G and its counterpart Code Division

3   Multiple Access (CDMA) standards launched in the United States in the early 2000s.

4       48.     The adoption of 3G and 4G technology was driven by the demand for greater

5   transmission capacity and speed compared to the existing technologies available in earlier

6   generation technology.  For example, 3G Universal Mobile Telecommunications Service

7   ("UMTS") uses wideband CDMA ("WCDMA"), a technology used to increase the amount of

8   data that can be exchanged on the bandwidth of mobile telecommunications.  3G mobile phones

9   can, in addition to classic voice calls, transmit and receive data such as, for example,

10  downloading of music and video files.

11      49.     A 4G network goes further.  4G LTE provides mobile ultra-broadband Internet

12  access, for example to laptops with USB wireless modems, to smartphones, and to other mobile

13  devices.  Many 4G networks are also compatible with legacy 2G and 3G systems.  This allows

14  users to make connections regardless of their geographic location or type of mobile phone, and

15  especially when operating in an area where there is no 4G network.  Thus, the majority, if not all,

16  of the marketed 4G mobile phones can also function in 3G and/or 2G modes.

17      50.     WLAN or "Wi-Fi" and/or "802.11" ("Wireless Standards") is a widely practiced

18  standard for wireless Internet connectivity that enables an electronic device to access the Internet

19  wirelessly at high speeds over short distances.  WLAN networks typically consist of one or more

20  access points that are connected to an Ethernet local area network, each of which communicates

21  by radio signals with devices such as notebook computers and other electronics devices.  The use

22  of WLAN technology has grown in the United States since its introduction in the 1990s.

23  Manufacturers now offer WLAN connectivity in a wide array of devices and for many different

24  reasons and purposes.

25              **Ericsson's Involvement in Development of the Wireless Standards**

26      51.     Ericsson is a member of ETSI and 3GPP, and a contributor to the ETSI standard.

27  Ericsson declared numerous IPRs to ETSI, including United States patents and patent

COMPLAINT FOR BREACH OF CONTRACT
CASE NO. 2:17-CV-534 – PAGE 15

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1   applications assigned to Ericsson.  In addition, upon information and belief, Ericsson has played

2   a role in the 3GPP standardization process.

3          52.     As a 3GPP "Individual Member," Ericsson is "bound by the IPR policy" of ETSI.

4   At various times, Ericsson, along with its subsidiaries and affiliates, has declared to ETSI that a

5   number of its patents and patent applications are or are likely to become essential to one or more

6   of the Mobile Cellular Standards.  Consistent with, and pursuant to, ETSI's IPR Policies,

7   Ericsson has submitted an IPR Information Statement and Licensing Declaration for each patent

8   or patent application it believes to be standard-essential.  In each such declaration, Ericsson

9   promised to "grant irrevocable license under the IPRs on terms and conditions which are in

10  accordance with Clause 6.1 of the ETSI IPR policy."  Ericsson has submitted at least 64 ETSI

11  IPR Licensing Declaration forms through which it has declared a large number of its United

12  States and foreign patents and patent applications essential to the standards.  Many of these

13  patents and patent applications were assigned to and licensed by Ericsson Corporation's wholly-

14  owned licensing subsidiaries.

15         53.     In reliance on declarations such as the ones submitted by Ericsson, ETSI released

16  the Mobile Cellular Standards.  Once Ericsson disclosed that it held essential patents, but for a

17  licensing commitment from Ericsson that it would grant licenses to these patents on FRAND

18  terms, ETSI would have: (1) revised the standards to employ alternative technologies, (2)

19  stopped working on the standards, or (3) taken other action to ensure the Mobile Cellular

20  Standards would be available for use by everyone on FRAND terms and conditions.

21         54.     In submitting its declarations in accordance with ETSI's IPR Policy, Ericsson

22  entered into a contract with ETSI for the benefit of ETSI members and any entity that

23  implements and/or adopts the Mobile Cellular Standards.  Ericsson is bound by its agreements to

24  license its patents consistent with the referenced ETSI IPR Policy.  HTC is, therefore, a

25  beneficiary of Ericsson's contractual obligations and promises to ETSI.

26         55.     Similarly, Ericsson is a member of the IEEE and a contributor to the WLAN

27  standard.  Ericsson declared numerous IPRs to the IEEE-SA, including United States patents and

COMPLAINT FOR BREACH OF CONTRACT
CASE NO. 2:17-CV-534 – PAGE 16

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

patent applications assigned to Ericsson.  In addition, upon information and belief, Ericsson has played a role in the WLAN standardization process.

56.    Ericsson submitted Letters of Assurance pursuant to Clause 6 of the IEEE-SA Standards Board Bylaws that it would offer to license any of its patents or patent applications that it identified as "essential" to the applicable WLAN standards to any entity under reasonable rates on a non-discriminatory basis.  The IEEE and its participants and affiliates relied on Ericsson's promises in developing, adopting, and implementing the IEEE-SA technical standards.  These standards are now implemented worldwide in a variety of electronic devices that have become commonplace.

## C.    HTC'S RELIANCE ON COMMITMENTS WITH RESPECT TO THE MOBILE CELLULAR AND WIRELESS STANDARDS

57.    Relying on the integrity of the SDO process and the commitments made by Ericsson regarding the IPRs that it deems essential, HTC developed, marketed, and sold its mobile phone products with the 3G, 4G, and/or Wi-Fi connectivity.

58.    HTC has invested substantial resources in developing and marketing products that implement these standards worldwide, including in the United States, and particularly in Washington.  HTC did so in reliance on the assurances of participating IPR holders—including Ericsson—that any patents identified pursuant to ETSI's and the IEEE-SA's IPR Policies by such IPR holders would be licensed on FRAND terms, regardless of whether such IPRs were, in fact, used in any particular implementation.  Accordingly, HTC is a third-party beneficiary of Ericsson's FRAND commitments to ETSI, 3GPP, and the IEEE-SA.

## D.    THE PRIOR ERICSSON/HTC LICENSING AGREEMENTS AND SUBSEQUENT DECLINING VALUE OF ERICSSON'S SEPS

59.    In 2003, HTC signed a license to Ericsson's portfolio of patents essential to the Mobile Cellular Standards pursuant to its express understanding that the licenses were, and would remain, subject to FRAND pricing.  In 2008 and 2014, the parties agreed to expand the coverage and duration of the license.

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

60.     Although the terms of the parties' agreements are confidential, the underlying terms were negotiated when 2G, 3G, and 4G, respectively, were cutting-edge technologies that represented a significant step forward in data capacity and speed.  The mobile device market was rapidly expanding, as smartphones were introduced to and embraced by both enterprise and individual consumers.

61.     The parties themselves were in very different positions as well.  When the first agreement was negotiated in 2003, HTC was a dominant market player whose growth was rapidly accelerating after being selected to be Microsoft's first hardware platform development partner for the Windows Mobile operating system (based on Windows CE).  In 2008, HTC had just recently partnered with Google to build the first mobile phone running Google's Android mobile OS, the G1.  Ericsson was likewise the world's largest supplier of network equipment and related services to telecom operators, serving well over 40 percent of all mobile subscribers and with customers in more than 175 countries.

62.     Since the expiry of the first two agreements between HTC and Ericsson, market share and revenues for both companies have plunged.  Because of the market uncertainty at the time, when the companies negotiated a third license agreement in 2014, they agreed to a shorter license term of two years.

63.     The downward market trends for both companies have not yet reversed.  In the fourth quarter of 2016, HTC reported robust sales but the year-over-year revenue numbers were down.  At the same time, Ericsson announced in October 2016 that it would cut 3,000 jobs in Sweden which comprised nearly 20 percent of its local workforce and that it would downsize operations at several plants as part of its global plan to cut costs by $1 billion in 2017.[8]  That

---

[8] The Associated Press, *Sweden's Ericsson cuts 3,000 jobs, reduces operations*, USA Today (Oct. 4, 2016), http://www.usatoday.com/story/money/business/2016/10/04/sweden-ericsson-telecom-job-cuts/91529530/.

COMPLAINT FOR BREACH OF CONTRACT
CASE NO. 2:17-CV-534 – PAGE 18

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

same month, Ericsson reported a 94 percent plunge in quarterly operating profit and tumbling sales, leading to its shares trading at an eight-year low.[9]

### The Declining Value of Ericsson's SEP Portfolio

64.     Since 2003, new technologies and product features—many of which have nothing to do with the Mobile Cellular or Wireless Standards—have become prevalent and a driving force behind consumer demand.  As a result, the legacy 2G and 3G technologies, and even 4G technology, necessarily represent a smaller component of the overall product price.  The decline in the value of these legacy technologies is further demonstrated by the decision by wireless carriers to shut down their 2G and 3G networks.  For example, AT&T discontinued service on its 2G wireless network as of December 31, 2016.  T-Mobile is contemplating shutting down its 3G network by 2019.  Meanwhile, customers and carriers are looking forward to the next progression in cellular technology, mainly 5G.  Large-scale deployments of 5G are expected by 2019, with Verizon Wireless promising delivery of 5G service to pilot customers in 11 markets across the United States by mid 2017.

65.     Meanwhile, HTC has introduced and continues to introduce additional non-telecom features such as user interface enhancements, motion gesture, camera enhancements, audio enhancements, motion launch, flip to mute, photo editor, and others.  Despite the increasingly superior product features, the average selling price (ASP) for HTC's mobile devices has dropped dramatically in recent years, as it has for the rest of the industry.

66.     Even since the parties' last agreement in 2014, there has been an acceleration in market forces that are transforming the wireless technology landscape in a more fundamental way.  On March 3, 2017, Ericsson announced its proposed royalty rates for its 5G portfolio.  Ericsson's announcement not only demonstrates its recognition of the shift away from the legacy

---

[9] Reuters, *Crisis at Ericsson deepens as profits plunge 94 pct*, CNBC (Oct. 12, 2016), http://www.cnbc.com/2016/10/12/crisis-at-ericsson-deepens-as-profits-plunge-94-pct.html.

COMPLAINT FOR BREACH OF CONTRACT
CASE NO. 2:17-CV-534 – PAGE 19

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1    and increasingly obsolete 3G and 4G technologies, but the announced rates further demonstrate

2    that Ericsson is demanding excessive rates that are not FRAND.

3           67.    In its Annual Report for 2016, Ericsson explains that, today, "[t]he majority of

4    today's IPR licensing revenues are generated from handset suppliers," such as HTC.  However,

5    Ericsson has repeatedly acknowledged existing market forces have already changed that

6    dynamic.  The same Annual Report further explains, "Ericsson is expanding the licensing

7    business to cover products beyond handsets as connectivity is introduced in industries other than

8    telecommunications."  This increase in demand will not be driven by legacy technologies

9    (especially not 2G or 3G) or by demand for traditional handset devices.  Instead, Ericsson's

10   Annual Report states that future demand will be driven by "interest in digital transformation

11   enabled by 5G, IoT (Internet of Things) and Cloud. . . . While the earlier generations of mobile

12   technology offered connectivity to mobile phones and smartphones, the transition to the next

13   generation, 5G, will involve devices beyond smartphones.  Ericsson estimates that there will be

14   29 billion connected devices in 2022, of which 18 billion will be related to Internet of Things"

15   compared to only 6.8 billion handsets.

16          68.    Because the value of its portfolio and patented technology changes over time, on

17   information and belief, Ericsson conducts annual internal reviews of its licensing rates for its 2G,

18   3G, and 4G standard essential patents to adjust the reference royalty rates that it uses as

19   benchmarks for FRAND negotiations.  For example, after its March 2016 annual internal review,

20   Ericsson decided to transition its reference rate system from a percentage running royalty rate

21   system to a fixed-fee-per-unit (or "dollar-per-unit") rate system to make up for the dramatic drop

22   in the sales price of standards-compliant handset devices in recent years.  Unlike a percentage

23   running royalty rate system (in which licensees must pay some percentage of the sales price for

24   each device sold), the fixed-fee-per-unit rate system requires licensors to pay a fixed fee for each

25   device sold, regardless of how much the device's sales price may fall.

26          69.    Ericsson's SEPs are less valuable today as a result of these other advancements,

27   and their value will continue to decline in the coming years as more and more of its SEPs

COMPLAINT FOR BREACH OF CONTRACT
CASE NO. 2:17-CV-534 – PAGE 20

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

continue to expire.  On information and belief, at least a one-third of Ericsson's Mobile Cellular SEPs will expire between 2017 and 2020.  Meanwhile, the rate of new patents issued to Ericsson has declined dramatically.  At a minimum, Ericsson's expiring patents and declining invention rates should be taken into account for determining any new royalty rate.

70.     On information and belief, Ericsson transferred and sold to Unwired Planet, Inc. ("UP") 2,185 patents and patent applications covering technology utilized in telecommunications infrastructure including signal processing, network protocols, radio resource management, voice/text applications, mobility management, software, hardware, and antennas.  Of the 1,922 issued patents, 753 are United States patents.  Ericsson further agreed to assign to UP, for no additional consideration, 100 patents each year, provided that Ericsson may choose to accelerate such contribution to be made at one time or over a shorter period of time.  In exchange, UP agreed to pay Ericsson a portion of UP's cumulative gross revenue.

71.     In addition to this example, Ericsson has likely entered additional transactions in which it sold or otherwise divested itself of additional SEPs that must be considered in assessing a reasonable royalty for its remaining portfolios.

**E.     ERICSSON'S BREACH OF ITS OBLIGATION TO LICENSE ITS SEPS ON FRAND TERMS**

72.     HTC's license to Ericsson's SEPs expired on December 31, 2016.

73.     HTC has repeatedly made clear its willingness and intention to enter new license agreements with Ericsson, and that it will pay license fees that are fair and reasonable.  HTC has negotiated, and is prepared to negotiate, in good faith with Ericsson to obtain FRAND rates for the licenses to all patents that Ericsson has declared to be essential to the Mobile Cellular Standards.

74.     But with willful disregard of the commitments it made to ETSI, 3GPP, and the IEEE-SA, Ericsson has refused to provide HTC a FRAND rate to license Ericsson's SEP portfolio.  Instead, Ericsson is exploiting the significant economic power it gained as a result of the purported inclusion of its technology into the Mobile Cellular and Wireless Standards by

1  demanding royalty payments that are wholly disproportionate to the royalty rate that its patents

2  should command under any reasonable royalty determination, and far in excess of any

3  independent value they would have absent their inclusion in the standards.

4       75.    Because it became clear that Ericsson would not offer a reasonable rate on its

5  own, HTC retained two telecommunications industry experts to determine the value of

6  Ericsson's SEPs.  Among other things, that analysis considered relevant market factors (e.g.,

7  slower industry growth, declining average selling price, lower margins), the technical merits of

8  Ericsson's SEP portfolio, the increasing importance of product features unrelated to Ericsson's

9  SEPs, emerging alternative technologies, and well-established patent valuation principles.  The

10  analysis demonstrated that Ericsson's demand was in far excess of a rate that would be fair and

11  reasonable.

12      76.    The competition in the markets for HTC products is intense.  As result, the profit

13  margins for HTC and many companies in the market are small or non-existent.  Therefore, any

14  unfair or unreasonable royalty will significantly impact overall profit margin and prevent HTC

15  from being competitive in the marketplace.  It is therefore essential for HTC to obtain FRAND

16  rates for Ericsson's SEPs.

17      77.    Absent the negotiating leverage that Ericsson obtained through the standards

18  process, Ericsson would not have been in a position to exploit its essential patents to attempt to

19  extort unreasonable terms from HTC.

20      78.    With the expiration of the 2014 license agreement between Ericsson and HTC,

21  HTC now faces imminent loss of coverage from protection against patent infringement actions

22  and exposure to a high risk of litigation in the United States and other jurisdictions, of devices

23  that allegedly utilize Ericsson's claimed essential patents.

24      79.    Notably, Ericsson is among hundreds of companies with purported essential

25  patents relevant to these technologies.  If each company with a FRAND commitment is

26  permitted to charge excessive royalties, the burden on downstream products will leave little room

27  for profitability, discourage further investment, and chill device innovation and competition

COMPLAINT FOR BREACH OF CONTRACT
CASE NO. 2:17-CV-534 – PAGE 22

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1   altogether.  Not only would device manufacturers like HTC be harmed in their business, but so

2   too would consumers, who ultimately would suffer higher device prices and less innovation.

3                                    **CLAIMS FOR RELIEF**

4                                 **FIRST CAUSE OF ACTION**

5                                    **(Breach of Contract)**

6        80.    HTC realleges and incorporates by reference the allegations set forth in all of the

7   preceding paragraphs, as though fully set forth herein.

8        81.    Ericsson entered into contractual commitments with ETSI, 3GPP, the IEEE-SA

9   and their respective members, participants, and implementers relating to the Mobile Cellular and

10  Wireless Standards.

11       82.    Each third party that would potentially implement the Mobile Cellular and

12  Wireless Standards was an intended beneficiary of those contracts.

13       83.    HTC is an intended beneficiary of those contracts.

14       84.    Ericsson was contractually obligated to offer a license to its SEPs consistent with

15  the applicable IPR policy of ETSI and 3GPP, including that such a license be on FRAND terms.

16       85.    Ericsson was further contractually obligated to offer a license to its SEPs

17  consistent with the applicable IPR policy of the IEEE-SA, including that such a license be on

18  RAND terms.

19       86.    Ericsson has refused to offer a FRAND rate.  Instead, HTC understands that

20  Ericsson is basing the demanded royalties for its SEPs on prior license agreements that were

21  based on the value of entire devices (e.g., smartphones and tablet computers).  The law requires,

22  however, that royalties be set using as the royalty base (at most) the smallest saleable unit that

23  substantially embodies the patented technology, to which a reasonable royalty rate is then

24  applied.  For these patents, that royalty base would be (at most) the baseband processor chip that

25  performs telecommunications processing functions.  The law also requires that the royalties be

26  set to reflect the value of the patented technology alone.  For Ericsson's SEPs, that would

27

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1  acknowledge the decline in the significance of the technology, including that this technology has

2  declining impact on consumer demand.

3      87.     Ericsson has refused to accept the FRAND rate calculated by HTC's

4  telecommunications technology and market experts, who HTC hired to evaluate Ericsson's SEP

5  portfolio.  By failing to reduce rates to account for a declining value in its portfolio, Ericsson is

6  attempting to extract unfair and unreasonable rates by demanding rates higher than the fair and

7  reasonable value of the patented technology.

8      88.     Ericsson breached its contracts by refusing to license its SEPs under reasonable

9  rates, with reasonable terms, and on a non-discriminatory basis.

10     89.     As a result of Ericsson's contractual breach, HTC has been injured in its business

11 or property, and is threatened by a gap in coverage from patent infringement protection and thus

12 an imminent loss of profits, loss of customers and potential customers, and loss of goodwill and

13 product image.

14     90.     HTC has suffered and will continue to suffer irreparable injury by reason of the

15 acts, practices, and conduct of Ericsson alleged above until and unless the Court enjoins such

16 acts, practices, and conduct.

17                    **SECOND CAUSE OF ACTION**

18                 **(Implied Covenant of Good Faith and Fair Dealing)**

19     91.     HTC realleges and incorporates by reference the allegations set forth in all of the

20 preceding paragraphs, as though fully set forth herein.

21     92.     Ericsson has acted in bad faith by refusing to license Ericsson's patents essential

22 to the Mobile Cellular and Wireless Standards on FRAND terms and rejecting HTC's fair,

23 reasonable, and nondiscriminatory offer, while forcing HTC to face loss of coverage from

24 protection against patent infringement actions and exposing HTC to litigation in the United

25 States and other jurisdictions, for devices that allegedly utilize Ericsson's claimed essential

26 patents.

27

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

93.     Ericsson has, accordingly, wrongfully and intentionally breached the covenant of good faith and fair dealing by denying HTC the benefits to which they are entitled under Ericsson's FRAND obligations.

## THIRD CAUSE OF ACTION

### (Promissory Estoppel)

94.     HTC realleges and incorporates by reference the allegations set forth in all of the preceding paragraphs, as though fully set forth herein.

95.     Ericsson made a clear and definite promise to licensees through its public commitments to ETSI, 3GPP, and the IEEE-SA, and that it had granted, or would grant, to third parties licenses to any essential patents under reasonable rates, with reasonable terms, and on a non-discriminatory basis.

96.     The intended purpose of Ericsson's promises was to induce reliance upon this promise so that companies like HTC would produce mobile phone products compatible with the relevant standards.  Ericsson knew or should have reasonably expected to know that it would induce reliance on these promises by companies such as HTC.

97.     HTC developed and marketed its products and services in reliance on Ericsson's promises, including making its products and services compliant with Mobile Cellular and Wireless Standards.

98.     HTC entered into license agreements with Ericsson in reliance on Ericsson's continued promises, including assurances that Ericsson would continue to license its SEPs under reasonable royalty rates, with reasonable terms, and on a non-discriminatory basis.

99.     Ericsson is estopped from reneging on these promises to ETSI, 3GPP, the IEEE-SA and their respective members, participants, and implementers under the doctrine of promissory estoppel.

## PRAYER FOR RELIEF

WHEREFORE, HTC prays for relief as follows:

A.     Adjudge and decree that Ericsson is liable for breach of contract;

COMPLAINT FOR BREACH OF CONTRACT
CASE NO. 2:17-CV-534 – PAGE 25

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

B.      Declare that Ericsson has not offered royalties to HTC under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination;

C.      Enjoin Ericsson from further demanding excessive royalties from HTC that are not consistent with Ericsson's FRAND obligations;

D.      Declare that HTC is entitled to license from Ericsson any and all patents that Ericsson deems "essential" and/or has declared "essential" to the Mobile Cellular and Wireless Standards under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination;

E.      Determine the FRAND rates that HTC is entitled to for each of the Mobile Cellular and Wireless Standards;

F.      Enter judgment awarding HTC a license from Ericsson to any and all patents that Ericsson deems "essential" and/or has declared "essential" to the Mobile Cellular and Wireless Standards under the Court's determined FRAND rate, with reasonable terms and conditions that are demonstrably free of any unfair discrimination;

G.      Enter judgment against Ericsson for the amount of damages that HTC proves at trial, including, as appropriate, exemplary damages;

H.      Enter a judgment awarding HTC its expenses, costs, and attorneys' fees under applicable laws;

I.      Award HTC pre-judgment and post-judgment interest to the full extent allowed under the law, as well as its costs; and

J.      For such other and further relief as the Court deems just and proper.


Dated:  April 6, 2017

/s/ Gregory L. Watts
Gregory L. Watts, WSBA #43995
**WILSON SONSINI GOODRICH & ROSATI**
Professional Corporation
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Telephone: (206) 883-2500

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

Facsimile: (206) 883-2699
Email: gwatts@wsgr.com

James C. Yoon, CA Bar #177155
(*pro hac vice application pending*)
Dale R. Bish, CA Bar #235390
(*pro hac vice application pending*)
**WILSON SONSINI GOODRICH & ROSATI**
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100
Email: jyoon@wsgr.com
        dbish@wsgr.com

Oliva M. Kim, CA Bar #228382
(*pro hac vice application pending*)
**WILSON SONSINI GOODRICH & ROSATI**
Professional Corporation
633 West Fifth Street, Suite 1550
Los Angeles, CA 90071
Telephone: (323) 210-2900
Facsimile: (866) 974-7329
Email: okim@wsgr.com

*Attorneys for Plaintiffs*
*HTC Corporation and HTC America, Inc.*

**COMPLAINT FOR BREACH OF CONTRACT**
CASE NO. 2:17-CV-534 – PAGE 27

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699